UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RANDALL EUGENE JONES,

      Plaintiff,

v.                                Case No. 8:24-cv-71-JLB-SPF

KYLE EVERETT BURCH and
HIRSCHBACH MOTOR LINES, INC.,

      Defendants.

_____/

**<u>ORDER</u>**

Before the Court is Plaintiff Randall Eugene Jones's *Daubert* Motion to Strike Nicole Bonaparte's Opinions as to Reasonable Value of Bills (Doc. 63) and Defendants Kyle Everett Burch's and Hirschbach Motor Lines, Inc.'s response in opposition (Doc. 69). Also before the Court is Defendants' Motion to Exclude Certain Expert Testimony and Opinions of Dr. Phillip Pullen (Doc. 64), Defendants' Motion to Exclude Certain Expert Testimony and Opinions of Plaintiff's Expert Life Care Planner Dr. Angel Rigueras (Doc. 65), and Plaintiff's responses in opposition (Docs. 67, 68).

Upon due consideration, Plaintiff's *Daubert* Motion to Strike Nicole Bonaparte's Opinions as to Reasonable Value of Bills (Doc. 63) is denied; Defendants' Motion to Exclude Certain Expert Testimony and Opinions of Dr. Phillip Pullen (Doc. 64) is granted in part and denied in part; and Defendants' Motion to Exclude Certain Expert Testimony and Opinions of Plaintiff's Expert Life Care Planner Dr. Angel Rigueras (Doc. 65) is denied.

1

## BACKGROUND

Plaintiff initiated this action in state court in October 2023 and Defendants removed it to this Court in January 2024 based on the Court's diversity jurisdiction.  (Docs. 1, 1-1). Plaintiff sues Defendants for alleged personal injuries resulting from a motor vehicle accident that occurred in early March 2023. (Doc. 1-1).  Plaintiff requests damages to cover, *inter alia*, past medical expenses of approximately $240,000 and future medical expenses.  (Doc. 60).

Since that time, both parties have retained experts that they wish to call at trial. Plaintiff retained Dr. Angel Rigueras and Dr. Phillip Pullen to testify about his condition, the cause of his injuries, and future medical needs and costs while Defendants retained Nicole Bonaparte, a medical coding and billing expert, to discuss the reasonable value of Plaintiff's medical bills.  (Docs. 63, 64, 65).  The Court will address each motion in turn.

## LEGAL STANDARD

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of that testimony.  *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005).  As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993), the admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.   Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion ... if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  "Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589).  The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to these requirements as the "qualification," "reliability," and "helpfulness" prongs, and while they "remain distinct concepts," "the courts must take care not to conflate them." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

As for the qualification prong, an expert may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand." *See id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena*

3

*Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at \*1 (S.D. Fla. Jun. 25, 2009)).

As to whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation and internal quotation marks omitted). To make this determination, the district court typically examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *See id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). The Eleventh Circuit has emphasized that the four factors above are not exhaustive, and a court may need to conduct an alternative analysis to evaluate the reliability of an expert opinion. *See id.* at 1262 ("These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."). Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *See id.* at 1258 (citing *Kumho Tire Co.*, 526 U.S. at 152).

Finally, the helpfulness of an expert's testimony turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *See id.* (quoting *Cook ex rel. Est. of Tessier v. Sheriff of*

*Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *See id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

It is important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## DISCUSSION

### A.  Nicole Bonaparte

Ms. Bonaparte is a medical coding and billing specialist with over twenty-seven years of experience in evaluating the accuracy of medical bills and Current Procedural Terminology codes ("CPT codes") in a variety of medical fields. (Doc. 63-1 at 3). CPT codes are "widely accepted medical nomenclature" and are "used to report medical procedures and services under public and private health insurance programs" and for claims processing. (*Id.*) (quotation marks and citation omitted). Ms. Bonaparte is a Certified Professional Coder and Certified Medical Reimbursement Specialist. (Doc. 63-3 at 5). Among other things, she is a consultant for doctors providing them with training for medical coding and billing, including establishing fees and fee schedule management. (*Id.* at 4).

Ms. Bonaparte was retained as an expert witness by Defendants "regarding the fair market value/reasonableness and Medicare rates of the charges and costs of Plaintiff's medical services, treatments and/or procedures for injuries allegedly sustained as a result of the subject accident." (Doc. 69-2 at 3-4). Ms. Bonapart provided an initial and a supplemental report with her conclusions and has been deposed in connection with her proposed testimony. (Docs. 63-1; 63-2).

In her report, Ms. Bonapart explained that a "usual, customary and reasonable charge" is what a provider charges "for a service less than or equal to a charge percentile threshold for that service in the medical market where the service was delivered." (Doc. 63-1 at 26). Ms. Bonapart also identified errors in Plaintiff's medical bills, including "unbundled procedures." (*Id.* at 27). This is where procedures or treatments are coded and billed for in separate pieces instead of the usual "single, comprehensive procedure or service code." (*Id.*).

In reaching her conclusions, Ms. Bonaparte reviewed Plaintiff's medical record and corresponding bills to determine whether there were medical coding and billing errors, including "whether the medical records indicated that the services and procedures identified by procedure codes are the services and procedures provided." (*Id.* at 44). She also determined the market rate for each CPT code in Plaintiff's medical record. (*Id.* at 29-49). To make this determination, Ms. Bonaparte used two different databases, Practice Management Information Corporation Medical Fees ("PMIC") and Find-A-Code, to determine how much physician peers in Plaintiff's providers' zip codes and specialties charged for the same services received by Plaintiff. (*Id.* at 44-45). She also pulled Medicare reimbursements for each of the same CPT codes from government databases. (Doc. 63-2 at 32:11-34:25). She then compared Plaintiff's physicians' charges to the billings of their peers

6

and Medicare reimbursement rate to determine the reasonable value of Plaintiff's medical services. (Doc. 69 at 12) (citations omitted). Ultimately, Ms. Bonaparte concluded that Plaintiff's providers' charges "were above the usual, customary and reasonable in the community." (Doc. 63-1 at 26-27). She specifically found that Plaintiff's past medical expenses exceeded the following: 1) $13,863.49 if Plaintiff did not have health coverage; 2) the range of $24,800 to $52,349; and 3) the average charge of $38,754. (*Id.* at 26). Ms. Bonaparte also concluded that there were $99,670 worth of medical coding and billing errors in Plaintiff's medical bills attributable to the unbundling of procedures. (*Id.* at 27).

Plaintiff now moves to exclude Ms. Bonaparte's testimony regarding the reasonableness of the value of Plaintiff's medical bills, arguing that she is not qualified to render these opinions, her methodology was unreliable, and her testimony will not be helpful to the jury. (Doc. 63). For the reasons explained below, the Court disagrees.[1]

        i.     Qualification

Plaintiff argues that Ms. Bonaparte lacks the necessary qualifications to provide an expert opinion on the reasonableness of Plaintiff's medical bills because she does not have experience as a doctor or in providing medical treatment. (Doc. 63 at 14-16). On the record before the Court, this challenge is unavailing.

While Ms. Bonaparte is not a medical provider, she has a robust and impressive background in medical coding and billing, including being a trainer for providers on establishing their fees and managing their fee schedules. This is sufficient to establish her qualification to testify about the reasonableness of Plaintiff's providers' fees. Her lack of medical training pertains more so to her credibility than her qualification. *See Clena Invs., Inc.*,

---

[1] The Court reorganized Plaintiff's arguments for the sake of clarity.

280 F.R.D. at 661 ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility.") (citation omitted).

        ii.     Reliability

Next, Plaintiff asserts that Ms. Bonaparte's methodology in reaching her conclusions was unreliable. (Doc. 63 at 7-11, 12-14, 17-19). Plaintiff argues that Ms. Bonaparte's report contains hearsay within hearsay and that her methodology cannot be tested. (*Id.*). Defendants counter that experts are permitted to rely upon hearsay and that Ms. Bonaparte's methodology is sound and can be tested. (Doc. 69). Defendants have the better argument.

The Court begins with Plaintiff's claim that Ms. Bonaparte's reliance on the fee databases will introduce inadmissible hearsay within hearsay. Rule 803(17) states that "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations" are not excludable under the hearsay rule. Fed. R. Evid. 803(17). Rule 703 also provides that an expert may rely on inadmissible facts or data in forming her opinion if experts in her field would reasonably rely on the same evidence. Fed. R. Evid. 703; *see Simkovitz v. Jetran Int'l, Ltd.*, 496 F. App'x 907, 910 n.2 (11th Cir. 2012). Here, it is well established that medical coding and billing experts routinely rely upon the databases identified by Ms. Bonaparte. *Wendy Marie Henshaw v. Wal-Mart Stores E., LP*, 2024 WL 4803923, at *3 (M.D. Fla. Oct. 21, 2024) (citing *Gonzalez v. Wal-Mart Stores E., LP,* 2024 WL 3505402, at *4 (M.D. Fla. Feb. 20, 2024)) (stating that "other courts have explained that experts in the medical billing industry routinely rely on the three databases that [the expert] used," including PMIC and Find-A-Code). Moreover, Ms. Bonaparte relies upon the databases to formulate her opinions on the reasonableness of Plaintiff's medical bills. As such, Ms. Bonaparte's opinions are not inadmissible on hearsay grounds.

As for Plaintiff's insistence that Ms. Bonaparte's methodology cannot be tested and has not been subjected to peer review, the Court is unconvinced. As pointed out by Defendants, any medical coding or billing expert with access to PMIC, Find-A-Code, and the government's Medicare databases would be able to retrace Ms. Bonaparte's steps and determine whether they would reach the same conclusions. *See Gonzalez,* 2024 WL 3505402, at *5 (finding that a medical coding and billing expert's methodology was sufficient because it "appear[ed] to be replicable, the primary requirement of the 'testability' factor") (citation omitted).

Nor does Plaintiff's claim that Ms. Bonaparte's methodology fails to account for discrepancies in charges between geographical areas and medical specialties have merit. In fact, his argument is demonstrably false since Ms. Bonaparte only relied upon information from the databases that was from doctors in the same zip codes as Plaintiff's providers' zip codes and used the CPT codes. Accordingly, Ms. Bonaparte's testimony is reliable.

        iii.    Helpfulness

Finally, Plaintiff asserts that Ms. Bonaparte's opinions will not be helpful to a jury because the databases she used "are not tools used to determine the reasonableness of medical treatment, which is the only relevant issue in this matter." (Doc. 63 at 11). Plaintiff misses the point. While the reasonableness of Plaintiff's medical treatment may be relevant, it is not the *only* relevant issue since Plaintiff must prove the amount of damages to which he is entitled. Therefore, evidence regarding the reasonableness of Plaintiff's medical costs is directly relevant to Plaintiff's damages request and will be helpful to the jury. Moreover, it can hardly be disputed that coding and billing practices of doctors is uncommon knowledge, so Ms. Bonaparte's testimony will be further helpful in demystifying the medical coding and

billing processes. *See Serrano v. Fam. Dollar Stores of Fla., LLC*, 2021 WL 3036673, at *3 (S.D. Fla. June 9, 2021) ("[T]he Court finds that [the medical billing and coding expert's] testimony will be helpful to the jury as medical billing and coding issues are beyond the knowledge of an ordinary juror.").

While there is a split in this District regarding the admissibility of medical billing and coding experts' testimony, *compare Gonzalez,* 2024 WL 3505402, at *5 *with Young*, 2024 WL 3639553, at *2, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (quotations omitted).   The Court therefore declines to exclude Ms. Bonaparte's testimony regarding the reasonableness of Plaintiff's medical bills.   Accordingly, Plaintiff's motion is denied.

### B.  Dr. Phillip Pullen

Dr. Pullen is a board-certified orthopedic surgeon at University Orthopedic Care with a Doctor of Osteopathic Medicine degree from Des Moines University from 1999.  (Doc. 64-3 at 6:20, 7:2); (Doc. 81-1).  He has been an orthopedic surgeon for over twenty years and has been a clinical professor for more than twenty-five years, serving at Lake Erie College of Osteopathic Medicine and Michigan State University College of Osteopathic Medicine.  (Doc. 81-1 at 2).  He performs operations on extremities and minimally invasive spine surgeries.  (Doc. 64-3 at 7:4-14).

Dr. Pullen was retained as an expert witness to review Plaintiff's medical record and testify regarding the cause and permanency of Plaintiff's injuries and has been deposed in connection with his proposed testimony.  (Doc. 64-3).  He performed a Comprehensive

Medical Exam ("CME") on Plaintiff in June 2024 and, after reviewing Plaintiff's medical record, provided a report with his conclusions about Plaintiff's condition and recommendations for future treatment. (Doc. 64-1). Included in this report is an overall impairment rating for Plaintiff which combines regional impairment ratings for portions of Plaintiff's spine. (*Id.* at 5-6). Dr. Pullen delegated the calculation of these figures to someone else at University Orthopedic Care, but reviewed Plaintiff's imaging and medical records that went in to calculating the scores and is familiar with the American Medical Association Guidelines of Permanent Impairment ("AMA Guidelines") used to make these calculations. (Doc. 68-2 at 42:1-12, 43:7-13, 66:2).

Defendants now move to prevent Dr. Pullen from testifying because the impairment ratings in the CME are not his and are speculative. (Doc. 64). Defendants also challenge Dr. Pullen's opinions regarding Plaintiff's future medical needs and costs. (*Id.*). In response, Plaintiff agrees to not elicit testimony from Dr. Pullen regarding Plaintiff's future medical needs and the associated costs, but disputes Defendants' claim that the impairment ratings are inadmissible. (Doc. 68). Accordingly, Defendants' motion is granted as to their request to bar Dr. Pullen from testifying about Plaintiff's future medical needs and costs. However, for the reasons stated below, Defendants' motion is denied as to Dr. Pullen's ability to testify regarding Plaintiff's impairment ratings.

Rule 703 permits expert testimony "based on firsthand observation of the witness, on facts or data presented at the trial, or on facts and data presented before the trial[.]" *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (alteration added). It does not permit an expert to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litig.*, 93 F.

11

Supp. 2d 1348, 1357 (N.D. Ga. 2000) (citations omitted). Courts thus need to "ensure that an expert witness is sufficiently familiar with the reasoning or methodology" underlying the expert's testimony. *Id.* (citation omitted).

The crux of Defendants' argument rests on *La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Spec. Ins. Co.*, 586 F. Supp. 3d 1300 (S.D Fla. Feb. 16, 2022). There, the defendant's expert worked on the initial expert report but had no part in the revisions that occurred two years later. *Id.* at 1306-07. The plaintiff therefore moved to preclude the expert from testifying at all because it would be tantamount to the expert simply adopting another expert's opinion. *Id.* The court disagreed, however. *Id.* Because the expert had heavy involvement in the development of the initial report and all but one section remained identical after the revisions, the court did not prevent the expert from testifying completely. *Id.* Instead, the court reasoned that the bulk of the report was the expert's creation based on his first-hand experience so he should be permitted to testify as to those portions. *Id.* The expert, however, could not testify about the portion of the report in which he had no input or personal experience because he did not collect any of the relevant information underpinning the estimate nor did he know how the figure was calculated. *Id.*

The case here is inapposite. Dr. Pullen personally examined Plaintiff and his medical record, including imaging, and Dr. Pullen explained at his deposition how the calculations are made. Thus, while he did not himself do the impairment rating calculations, he is "sufficiently familiar with the reasoning [and] methodology" used and the facts underpinning the calculations. *La Gorce Palace Condo.*, 586 F. Supp. 3d at 1306. Dr. Pullen is therefore not precluded from testifying about Plaintiff's impairment rating at trial. In light of the foregoing, Defendants' motion regarding Dr. Pullen (Doc. 64) is granted in part and denied in part.

12

### C.  Dr. Angel Rigueras

Dr. Rigueras is a board-certified and fellowship-trained interventional physiatrist at University Orthopedic Care with a Doctor of Osteopathic Medicine degree from Des Moines University.  (Doc. 65-1 at 1-3); (Doc. 65-3 at 5:17, 23); (Doc. 82-1 at 2-3).  Physiatrists specialize in the function of muscle, bones, nerves, and joints.  (Doc. 65-3 at 12:7-10).  Dr. Rigueras primarily sees patients (but is not Plaintiff's treating physician) and he teaches as a clinical professor at both his fellowship alma mater, the Michigan State University College of Osteopathic Medicine, and the University of Michigan Department of Nursing while also serving as an expert witness.  (Doc. 65-3 at 6:3-12, 16:2); (Doc. 81-2 at 2-3).  Dr. Rigueras has been a physiatrist and professor for over fifteen years.  (Doc. 81-2 at 3).  As part of his physiatrist training and practice, he has competency in functional biomechanics, including how the body moves in response to trauma.  (Doc. 65-3 at 11:23-12:10, 13:7-10).  Dr. Rigueras conducts diagnostic procedures, such as nerve blocks and spinal nerve injections, and surgical procedures, including spinal cord ablations and joint fusions.  (*Id.* at 9:23-10:16).

Dr. Rigueras was retained as an expert witness to review Plaintiff's medical record and testify regarding the cause of Plaintiff's injuries and his need for and the value of future medical care.  Dr. Rigueras provided an expert report (Doc. 65-2) and has been deposed in connection with his proposed testimony (Doc. 65-3).  Defendants, however, filed a motion to exclude Dr. Rigueras's testimony regarding the cause of Plaintiff's injuries and his future medical needs, arguing Dr. Rigueras is not qualified to render the opinions that he did, his methodology is unreliable, and his testimony will not be helpful to a jury.  (Doc. 65).  For the reasons explained below, the Court disagrees.

        i.      Qualification

Defendants argue that Dr. Rigueras lacks the necessary qualifications to provide an expert opinion on causation because he relies on biomechanical engineering to render his conclusions, but he is not a biomechanical engineer. (Doc. 65 at 6-8). Defendants point to examples in Dr. Rigueras's opinion where he references "biomechanical forces," like when he discusses how a body moves in collisions and because he includes the police report's rendering of the accident in which Plaintiff was injured. (*Id.* at 6-7). Plaintiff responds that Dr. Rigueras is not required to be a biomechanical engineer and he received relevant biomechanical training as part of becoming a physiatrist. (Doc. 65-1 at 9).

Defendants' argument is unpersuasive. Dr. Rigueras is a board-certified and fellowship-trained interventional physiatrist whose work and training include understanding and determining how a traumatic event, like a car accident, impacts a body. He also teaches his craft at two different universities and has over fifteen years of experience.

That Dr. Rigueras is not a biomechanical engineer does not undermine his qualification because he has training and experience in functional biomechanics and, when that training is coupled with his medical expertise, he is uniquely positioned to be an authority on how a traumatic impact can harm a body. Indeed, courts have determined that "'biomechanical engineers ordinarily are not permitted to give opinions about the precise cause of a specific injury' because 'biomechanical engineers lack the medical training necessary to identify the different tolerance levels and preexisting medical conditions of individuals, both of which could have an effect on what injuries resulted from an accident.'" *Fall v. Curran*, 2021 WL 698169, at *2 (M.D. Fla. Jan. 14, 2021) (quoting *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007), *aff'd*, 300 F. App'x 700 (11th Cir. 2008)). Therefore, Dr. Rigueras is qualified to opine on the cause of Plaintiff's injuries. *See Poltorak*

14

*v. Ferrell*, 2018 WL 1718688, at *6-7 (S.D. Fla. Jan. 4, 2018) (concluding than physiatrist was qualified to opine on the cause of the plaintiff's injuries were the defendants argued that the physician's opinion was one of engineering).  As noted above, "so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Clena Invs., Inc.*, 280 F.R.D. at 661 (citation omitted).

ii.    Methodology

Next, Defendants assert that Dr. Rigueras's methodology in reaching his opinions was unreliable.  (Doc. 65 at 8-18).  Beginning with Dr. Rigueras's causation opinion, Defendants argue that it is unreliable because he only reviewed Plaintiff's medical records and did not perform any tests or recreations mimicking the accident.  (Doc. 65 at 8-10).  Plaintiff responds that Dr. Rigueras relied upon Plaintiff's imaging, diagnoses, care history, injections, and surgery from his medical records to render all of his opinions, which is a testable, and therefore reliable, process.  (Doc. 10-12).  The Court agrees with Plaintiff.

Dr. Rigueras arrived at a causation opinion within a reasonable degree of medical probability after employing a sound methodological approach to correlate Plaintiff's injuries to the collision based upon a comprehensive review of his medical history, medical examinations, and consideration of other possible causes of the claimed injuries.  His methodology was therefore reliable.  *See Hoff v. Steiner Transocean, Ltd.*, 2014 WL 273075, at *4 (S. D. Fla. Jan. 24, 2014) ("As long as a reliable basis exists for the expert's opinion, it is admissible, and it is then up to the parties to vet the opinion before the jury.").

As for Dr. Rigueras's opinions about Plaintiff's future medical care and costs, Defendants assert that those are unreliable because Plaintiff's treating physicians' recommendations did not support Dr. Rigueras's conclusions.  (Doc. 65 at 10-18).  Plaintiff

counters that, not only did Dr. Riguera cite Plaintiff's providers, but he was entitled to render his own opinions about Plaintiff's future health needs.  (Doc. 67 at 10-15).   Plaintiff has the better position.

Dr. Rigueras based his recommendations for Plaintiff's future medical care on both the opinions of Plaintiff's treating physicians, including Dr. Pullen, and his own opinion as physiatrist.  Like with his causation opinion, Dr. Rigueras arrived at his conclusions within a reasonable degree of medical probability after employing a sound methodological approach, including reviewing Plaintiff's treating physicians' records and recommendations and relying upon Plaintiff's medical record and medical literature to support his findings.  At base, there is sufficient factual and analytical foundation in Dr. Rigueras's report to support his findings. *See Woienski v. United Airlines, Inc.,* 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019) ( stating that "an expert is permitted to form conclusions by extrapolating from existing data.") (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Bizarrely, the methodology Defendants apparently advocate for—that Dr. Rigueras only propose the recommendations of Plaintiff's treating providers—could render Rigueras's opinions unreliable since he is supposed to predicate those findings on his independent judgment.  *See Mchale v. Crown Equip. Corp.*, 2021 WL 289346, at *3 (M.D. Fla. Jan. 28, 2021), *aff'd,* 2022 WL 4350702 (11th Cir. Sept. 20, 2022) ("Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, without reaching independent conclusions in reliance on that opinion.") (citations omitted).

Case authority cited by Defendants supports this point.  In *Sims v. BMW of N. Am., LLC*, the court permitted a life care planner to testify regarding the plaintiff's future medical needs because, as here, the doctor provided a sufficient factual basis for his finding, including

16

citing treating providers, and by relying upon his own judgment. 2025 WL 714027, at *1-2 (M.D. Fla. Mar. 5, 2025). Meanwhile, in *Trinidad v. Moore*, a life care planner's opinion was found to be unreliable because she recommended surgery despite there being no records indicating the need and she did not know which type of surgery would be required, which is not the case here. 2016 WL 5341777, at *7 (M.D. Ala. Sept. 23, 2016). Ultimately, while the recommendation of a treating physician is relevant, a life care plan that contains recommendations that a treating physician did not make is not the dispositive, bright-line rule that Defendants wish it to be. As such, Dr. Rigueras's opinions as to Plaintiff's future medical needs and costs is reliable.

### iii. Helpfulness

Finally, Defendants argue that Dr. Rigueras's opinions regarding Plaintiff's future medical needs and costs will not be helpful to the jury because they are not reasonably certain. (Doc. 65 at 18-23). Specifically, Defendants point to Dr. Riguera's use of qualifying terms like "may" to support their position. (*Id.*). Plaintiff disagrees. (Doc. 67 at 12-14).

Defendants' challenge is easily dismissed. As found above, Dr. Rigueras provided an adequate factual basis upon which he founded his opinions, meaning his opinions were not speculative. Moreover, Dr. Rigueras's use of terms like "may" or "likely" when describing Plaintiff's future medical need will aid the jury in determining whether Plaintiff has satisfied his burden in proving those future needs. This matter may be explored on cross-examination by Defendants if they so choose, but it is insufficient to undermine the admissibility of Dr. Rigueras's testimony. As such, his testimony on the issue will be helpful to the jury. For these reasons, Defendants' motion as to Dr. Rigueras is denied.

17

Accordingly, it is ORDERED:

(1) Plaintiff's *Daubert* Motion to Strike Nicole Bonaparte's Opinions as to Reasonable Value of Bills (Doc. 63) is denied;

(2) Defendants' Motion to Exclude Certain Expert Testimony and Opinions of Dr. Phillip Pullen (Doc. 64) is granted in part and denied in part; and

(3) Defendants' Motion to Exclude Certain Expert Testimony and Opinions of Plaintiff's Expert Life Care Planner Dr. Angel Rigueras (Doc. 65) is denied.

**ORDERED** in Tampa, Florida, on April 20, 2026.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE